Thank you. Good morning. My name is John Seidlitz. I have the privilege to stand here today representing Ann Aarestad. This is a case involving Social Security benefits, a denial of both SSI, Supplemental Security Income benefits, and widow's benefits. Ann applied for benefits in May of 2006. She alleged disability beginning with her birth date, January 16th of 2006, when she's 50. You have to be 50 to qualify for the widow's benefits. She was denied at the administrative levels, went through the hearing with the ALJ, denied at the hearing. The appeal went to federal court and she initially filed that on her own. That's where I became involved. We filed briefs in front of the magistrate, Jeremiah Lynch, and Magistrate Lynch upheld the decision and that brings us here today. The basis for the disability involved in Ann is her right shoulder. It's mainly her right shoulder. I don't know if I will be able to pronounce the name of the joint as well as counsel. We were discussing that. I'm going to call it the AC joint. We have in mind where it is. You don't even have to try. Excellent. That was a huge hurdle for me this morning. What happens is she's got this problem with the right shoulder. She's right hand dominant and the shoulder is so bad that she's got not only muscle spasms that start at the base of the neck. They run down the trapezius to the shoulder and down into the shoulder. She also suffers from loss of feeling in the digits of the right hand, loss of feeling in three of the digits of the left hand. Those relate to carpal tunnel syndrome. She has bilateral carpal tunnel syndrome? She has bilateral carpal tunnel syndrome. She's had surgery on the left and recurrent bilateral carpal tunnel failed on the left. She has some borderline narrowing of the cervical spine. I don't know if I can argue the medicine to suggest what that's causing because I don't see the physicians arguing it other than it's a finding relied upon. I'll talk about that later in the doctors who ultimately make some opinions about her limitations. The last two issues she has which were not really addressed by the ALJ was COPD which the administration acknowledges she has, but whether or not that should have been included as an impairment is an issue before the court. We've argued it should have been. Consideration should have been given to limitations it's caused. When I get to the point about the vocational consultant, the vocational consultant was specifically told ignore the COPD. In terms of opinions about what she was able to do, the judge relied upon vocational testimony that specifically didn't include reference to the COPD. How did the COPD, chronic obstructive pulmonary disease, impair her ability to do the kind of light work which the vocational consultant found her able to do? I have to speculate because the vocational consultant didn't ever tell us. He didn't tell us because he was told not to consider that. Had he considered it, I think it would include the kinds of things that people with respiratory problems have. What kind of cleaning supplies are they exposed to based upon their work spot? If you're involved in big industrial buildings where you've got air like here where it's going through the whole building, cleaning supplies are a huge thing. Perfumes are a huge thing. If you have a lot of contact with the public, you don't even have control over co-employees who you can tell, no perfumes, no colognes. Her job was as a salesperson? The job that the judge said she could return to was as a sales management executive. What does that have to do with cleaning supplies and perfumes? I think it's going to put her into positions where she's going to be exposed to the public. She's a salesperson. She's dealing with the public and they're going to walk in with who knows what. At least we did not have the vocational consultant tell us whether that's a problem or not. He may say it's not a problem. I don't know. My point is he was not given that limitation so that he could then say, oh no, there's lots of jobs out there in clean environments or this sales marketing executive position is such that she'll be outside. I don't know. It's speculation because they didn't put it as part of the limitations. There's some minor references to depression and anxiety. I didn't do this at the hearings level, but there are just some minor references in there. But it was not considered. I'm not certain. It's a huge issue. We don't have a doctor that diagnosed that. Isn't that true? It was a PA that referenced it and there was one physician who PA, a physician's assistant. Yes. But the regulations don't include that. Is that correct? The regulations on PAs and the standard, I'm not certain of. In front of this court I've had the administration argue a couple of things. One is we have no standard. We don't know what it is for a PA, and they've suggested in other cases in front of the court, well, we ought to at least make it the same standard as denying the credibility of a lay witness. But in terms of the regulations, it's not even as low as the lay witness standard in terms of what needs to be considered with the physician's assistant. It's out of date. We've moved on where everybody's getting cared by PAs and the regs just simply don't tell us what kind of weight they get. But, yes, that is true. It seems to me that fundamental to her appeal and the genesis of the denial is this credibility finding. And so if things seem to radiate out from that in the decision, would you address that, please? Thank you. I think that is huge, and I think that there's two parts to the credibility issue. One part lies in what are the objective medical findings that support her complaints. The second part relates to what kinds of things had Anne described both in writing to the administration and at the time of the hearing that she said she could do. What the ALJ did, the administration said Anne's description of her activities is such that I don't believe she's limited because if she can do all these activities, she can't be disabled. The second part of that was the judge said, I'm not going to believe Dr. Smith and Dr. Askew, partly Dr. Askew, mostly Dr. Smith, because he relied upon Anne's activities in telling what she could do, and that's just inconsistent with disability. As to the first part, the various things that she could do, this is fairly common in these cases where people live their life. They garden a little. They cook. They take care of their family, that sort of thing. And the question is, is their ability to do these things, which you don't cook eight hours a day, you don't garden eight hours a day, is that transferable to the work setting? Exactly. But can we infer from the way the decision is written that the ALJ did infer that the activities cumulatively would be transferable? I don't think so. I don't see there's any possibility to say that, and that is because the ALJ is at the hearing. He has the opportunity, if he believes that, to at least get some finite amounts of time that are involved in the activities that he's relying upon. A lot of the activities were not even discussed at the hearing. They're bringing them out of the forms that they fill in front of the administration. But in terms of what was testified to at the hearing, I don't think it's possible to say that there was consideration given to an eight-hour time because she talks about doing dishes. She does dishes, and then the shoulder gets bad, and she says, I'll lie down for 20, 30, 40 minutes. Or I'll do laundry. She does laundry like every three days. There's no way to equate that into an eight-hour day because she's only doing it every three days. And then between loads, she'll lay down and get the shoulder. She has problem grasping, hard to grasp a plate doing dishes because of the hands. It's one of those things where they end up having to look to see what their hands are doing. When she does dishes, she can only do them for five or ten minutes. And to try to answer your question, I don't know how five or ten minutes of being able to do an activity, even as light as doing the dishes, equates into an eight-hour day. I don't think you can assume that. In terms of the cases have always suggested if you're going to take those home activities and say you can do something on the job, you need to equate physically what the person is doing as something that's transferable. And then you need some type of finite description of what's going on. Yeah, they're out mowing the lawn for eight hours a day. This was decided at step four? This was decided at, I think it's step four, where he said she could return to her previous work. So the ALJ didn't analyze at step five whether she could do any job in the national economy. Correct. There was some vocational testimony as to lighter work. I didn't want to mislead the court. I'm sorry. So your request here would be a remand for these findings to be made and for the vocational expert to be able to account for the pulmonary condition? I think the pulmonary condition and the opinions of Dr. Smith and Askew. Smith was ignored. Smith had some severe limitations in terms of how much she could use her hands. He had just examined her and found the numbness in all the fingers on the right and the three on the left and said she shouldn't be fingering, she shouldn't be feeling, pushing. And that was simply ignored. But in answer about remand, yes. The administration has recently been raising issues that are going to, in my humble opinion, require an on-balance relating to credit as true testimony. They're starting to raise that issue, saying the credit as true does not match up to some rules and regulations. It's partly argued in this brief. And so I would say even though I raised the issue of an award of benefits in my initial brief, I changed that in the reply brief, and that was intentional, seeking a remand only, because I don't want to deal with that credit as true issue. And that would allow the administration to consider the additional issues of credibility and Dr. Smith and ask you his limitations. Let me ask you about Dr. Smith, because he had the testimony that you referenced about the lifting and the use of the hands, but it was determined that actually that, in fact, was contradicted. And our standard of review is whether he's given a specific legitimate reason,  Why, at least with respect to Dr. Smith, doesn't that meet the standard on appeal? I don't think that in terms of what the ALJ used to reject Dr. Smith's opinion meets the standard at all. He said, the ALJ said, I do not believe Anne Arnstead's description of her activities, and I find that she's not credible in terms of describing her limits. And that, in part, then is used to reject Dr. Smith. As we've already discussed earlier in the argument, Anne described her daily activities. Those don't equate at all into anything beyond which Dr. Smith had indicated she could do in terms of five minutes of dishes or ten minutes of dishes or a little bit of laundry and then lying down. Next thing is, Dr. Smith's opinion is based upon objective findings. In other words, he's got the MRI of the shoulder, which shows all the degenerative changes and the impingements, as well as all of his exams. All of his exams come in showing muscle spasms and physical findings. So he's not just relying on subjective testimony from Anne. He's, in fact, relying on his own examinations to say these things happen. Do you want to save the remainder of your time? I would. Thank you. That you might. Thank you. May it please the Court, my name is Mike Howard, representing the Commissioner in the case of Erisad Viastro. Your Honors, before I address the main issues in the briefing, I'd like to correct a statement about the medical history made by Plaintiff's Attorney. Plaintiff's Attorney had referred to bilateral carpal tunnel syndrome, and Ms. Erisad having a surgery on the left hand. She had also had a surgery on the right hand, actually, I'd like to add that, and that was found to be effective in relieving the symptoms. And this is significant because the right hand is actually her dominant hand that she uses for most activities. At Step 2 of the sequential evaluation process, moving to the main issues in this case, at Step 2, Plaintiff was diagnosed with anxiety by a physician's assistant, as her attorney just discussed, and she contends that this should have been a severe impairment. Just to briefly address this, Ms. Erisad has just stated that we don't know the weight to give to a physician's assistant in her argument today. And that is, I believe, referring to agency rulings dealing with how ALJs should evaluate the weight to give to an opinion. And that is a different issue than we are dealing with here at Step 2 with regards to this physician's assistant. Here, the agency is simply stating that because this person was a physician's assistant rather than a doctor, like an M.D. or licensed psychologist, she was not an acceptable medical source, and therefore her diagnosis could not establish an impairment. Is that a matter of regulation? It is, Your Honor. And that only licensed physicians, psychologists, optometrists, and podiatrists can establish the presence of a, quote, medically determinable impairment, unquote. That is exactly correct, Your Honor. The regulation would be 20 CFR 444. Do we have a Ninth Circuit Court law which interprets those regulations in a different way so as to include a physician's assistant? I am not aware of any case law on that point, Your Honor. Presumably, physician's assistant's testimony could be considered in some light but not under that regulation as a medical testimony, correct? That is correct, Your Honor. Under agency rulings and regulations, and I believe also Ninth Circuit case law, they could describe the severity of the impairment once it's established. I do want to note, however, that when reviewing the record prior to this hearing a couple of days ago, I did find that plaintiff was diagnosed with anxiety by an MD in 2002 and 2003. And I believe that should have been noted in the commissioner's brief in the interest of full candor so that it did not appear to in any way make a factual misstatement. However, this earlier diagnosis by an MD does not change the argument that she was not diagnosed by an acceptable medical source during the relevant period in this case, which began in January 2006. And the ALJ cited to the opinion of Dr. Johnson, a psychologist who met with plaintiff in a capacity as a treating source and decided that she did not have the signs sufficient to show anxiety and any depression was under good control. So given all this evidence, it was proper to find she did not meet the first requirement to show a severe impairment, which is that it's diagnosed by an acceptable source. Let me tell you where one of my concerns is, and it really comes from our cases, where on the credibility finding and discounting what she can and can't do, the cases suggest that there needs to be some specific finding by the ALJ that these activities are transferable to the work setting and that they comprise a substantial part of her day. We don't have any such finding here. And there's some tension, I think, in the cases about whether you can infer this sort of thing. But all we have is a litany, and we don't have it connected up. Is that a deficiency that would require us to send it back? I do not believe so, Your Honor. In this case, the ALJ did not rely on her activities as direct evidence of an ability to work. These activities show that, therefore, she can work. What he stated was that her daily activities contradicted her claims of severe pain. And this is another way to look at daily activities, essentially one of two ways. That's recognized in agency regulations, I believe, and also Ninth Circuit case law. The case of Tomasetti refers to this method of analysis where, for instance, in this case, at the hearing before the ALJ, the plaintiff said that she was in mega pain, quote, mega pain, and she said it was a 10 on a scale of 0 to 10. And at the previous evening, she was unable to open the foil lid on a cup of yogurt. But then at that same hearing, she described gardening and doing laundry, and not just doing laundry intermittently as necessary for herself. She described how her teenage son was in an athletic team, and she had to regularly wash his uniforms, taking a couple hours a week a few times a week. And she would fold the clothes, put them in drawers, open and close the drawers, and a number of other daily activities. And at the hearing, didn't she open a bottle of pop? That is correct, Your Honor. That was not noted in the ALJ decision, but it was noted by the district court as potentially further evidence. She opened the trash cap. I'd hate to think this case would boil down to whether somebody might open a Coke at a hearing, however. I would agree, Your Honor. That should not be a dispositive thing. But she nonetheless described a number of activities that she could engage in, which self-evidently require one to use your hands to engage in those activities. And the ALJ, in the decision on page 13 of the administrative record, says despite the claimant's complaints of significant limitations with respect to the use of her arms and hands, she testified, and then the ALJ went on to list several of those activities. So I believe the ALJ is drawing that distinction between her claims of severe 10 out of 10 mega pain and doing a number of things that require the use of her hands. And although Ms. Arasad's attorney today had described how she would sometimes say that she would lie down after doing a certain task, at other times she'd say that she only had, for instance, occasional difficulty with buttons and zippers rather than just difficulty with buttons and zippers, or at the hearing she also said that when she takes her pain medication Lortab, which is another name for Vicodin, that she can clean and do things around the house. So the evidence in one sense varied, and it was therefore reasonable for the ALJ to make this line of analysis between her testimony about her activities and her severe claims of pain. Is it fair to say that the thrust of the ALJ's opinion is to whether she could go back to the job she had before? I'm sorry, Your Honor, I didn't fully follow you there. This was done at step four, correct? That's correct. The ALJ's determination was that she could go back being an account executive, right? That's correct. So all of this analysis is focused on that? Yes, Your Honor. We didn't get to the point of step five, right? That is correct, although I suppose the issue of remand or further proceedings are taken out, but there was some testimony about step five at the hearing, but it was not a finding made by the ALJ. I would talk about chronic obstructive pulmonary disease and step four at this point. As plaintiff has noted, her treating physician, Dr. Smith, has said that her COPD would make her unable to work around certain things like dust, fumes, cold, and other pulmonary irritants, and the ALJ did not discuss this, but we've described in our brief how this was harmless error under the facts of this case. The vocational expert at the hearing, well, I should say prior to the hearing, the vocational expert completed a form, gave it to the ALJ, and it's now part of the record at, I believe, 13E, Exhibit 13E, and the expert identified an entry in the Dictionary of Occupational Titles, which is a Department of Labor publication commonly relied on by Social Security, and this entry describes the occupation the expert believed was representative of the plaintiff's past relevant work, and this entry explicitly states that it does not involve exposure to extreme cold, and as noted in our brief, it explicitly states it does not involve exposure to, quote, atmospheric conditions, and when you look at the selected characteristics of occupational titles, I'm throwing out a number of agency jargon terms, so I apologize for that, but when you look at the definition of the term atmospheric conditions, that refers to dust and fumes and other pulmonary irritants, so this is explicit evidence that this past relevant work as an account executive would not aggravate COPD. The plaintiff, Ms. Aristad, in her argument today has referred to cleaning fumes and cologne and things of that nature. That is, as Ms. Aristad herself just admitted, speculation. That's not supported by looking at the Dictionary of Occupational Titles entry, which explicitly says no atmospheric conditions that would aggravate COPD. This is not a case where we're dealing with some sort of acute allergy to a cologne or another product such as that, and I'd also point to the expert's testimony at the hearing where the expert distinguished between jobs that would aggravate the condition and jobs that would not. Jobs that would aggravate the condition include a parking lot attendant where you're opening the door to your booth and you're interacting with people in cars. You're outdoors. You're getting the cold air and car fumes coming into your booth. Jobs that would not aggravate COPD, the expert explicitly said, would be indoor jobs such as information clerk or arcade attendant, and so this significantly undermines any argument from Ms. Aristad that an indoor job, such as a clerk position, would be incompatible with COPD just because at the end of the day the janitor comes by and uses some cleaning solutions. What was her former job? Her former job was account executive, Your Honor. In what area? It was in the industry of selling auto parts. As she described, she would travel to Napa auto parts stores and sell auto parts. I'd like to address one more point on the issue of chronic obstructive pulmonary disease and the Step 4 finding. Ms. Aristad has said that the ALJ, as repeatedly said in the briefing and in the argument today, that the ALJ instructed the expert to disregard COPD, and this is not a significant argument for several reasons. The first is that the ALJ had instructed him to disregard COPD. in the context of earlier jobs because that was a dispute about the evaluation of the evidence that the ALJ had with the expert. But in any event, the important point is that a precise hypothetical question that lays out each of the disability claimant's impairments to the expert is only required at Step 5 of the sequential evaluation process. So at Step 5, the ALJ is required to essentially list all the impairments that affect a person's ability to work and all their work restrictions and then ask the expert whether a person with these limitations could, whether there's any other jobs in the national economy this person could perform. They're required to either do that testimony with the expert or rely on the agency's medical vocational guidelines. At Step 4, there is no such requirement for a precise hypothetical question to the vocational expert. The agency regulations are much more permissive depending on the facts of the case. Step 4 finding can be based on work as it was actually done by the plaintiff, and the ALJ can simply rely on the plaintiff's description of her past work on forms or at the hearing. Or the Step 4 finding can be as it was generally performed, and as in this case, the ALJ can rely on the identification of an occupation in the Dictionary of Occupational Titles that says how this occupation is generally performed in the national economy. And for that reason, it is not a legal error or a dispositive issue that the ALJ may have instructed the expert to disregard the issue of COPD at the hearing. I'd like to return to the credibility finding by the ALJ briefly. In addition to the issue of daily activities, which we just discussed, the ALJ gave at least two other reasons to reject plaintiff's credibility, the lack of objective evidence, including evidence that she had good reflexes or that surgery, for instance, on her right hand, to relieve carpal tunnel syndromes was effective, and that the MRI, as Ms. Airstead refers to, the MRI of her shoulder, her right shoulder, showing degeneration. This MRI she cites to shows only, quote, mild degeneration, as interpreted by the radiologist reading the scan. The ALJ also noted her sporadic work history and that she had stopped working 11 years before the alleged onset of disability. And as the district court noted, this was a proper reason, as one of other reasons, to question her credibility. And Ms. Airstead does not challenge this specific finding of the ALJ with regards to her work history. I would just, in my remaining time, I would just briefly touch on the issue of plaintiff's treating physician, Dr. Smith, that she discussed at the hearing today. Plaintiff contends that Dr. Smith's opinion was based on an MRI. Again, this is the same MRI that only showed mild degenerative changes. And the ALJ did acknowledge that Ms. Airstead had some objective evidence supporting her condition and some limitation, but this doctor's opinion was clearly inconsistent with her admitted activities, which contradicted the doctor's opinion that she could, quote, never use her hands in the work environment. I see that my time has expired. Given this evidence, I'd ask that the court affirm the commissioner. Thank you. Oh, so much to cover so quickly. I'll try not to speak fast, just to cover the issues that I can cover here in a minute and a half. I think the important issues in front of the court are the fact that we've got three different treating physicians who have described this woman's exams, noting objective findings. She's got marked muscle spasms. She's got all of the complaints that she has with the physicians are objectively established by problems she's having, guarding. The muscles are seizing up to protect the area to keep it from being injured further. Dr. Seacrest saw her in 06. Dr. Askew, who had seen her back in 94 when she had numerous problems, and then saw her again one time visit and finds all of these objective findings. This isn't a case where the physicians, three of the treating physicians, are relying upon Ann to come in and tell them, here's my problems, I hurt. Other than muscle spasm, which is an objective finding, what are the other objective findings which are not reliant upon her responses? Significant restriction of forward flexion and extension. Is that an objective finding? Yes, absolutely. The physician pushes you forward and notes when the muscles start to guard and keep you from moving forward. I can't bend over to tie my shoes like I used to. That's because things in my back are restricting me. The physicians are trained to measure that. But it's not verbally coming out of her mouth saying, that hurts, or I can't do this or I can't do that. What's the other one? There's an MRI, 346 is the excerpt finding. There's impingement of the rotator cuff. There's impingement in the rotator cuff. And this is not just, I mean it's osteoarthritis. That's one of the diagnoses. But that's kind of the broad spectrum diagnosis of some extra bone and degeneration in the joint. But, I mean, there's impingement. My time is up, but the briefs contain some of those objective findings in the discussions of Dr. Smith, Dr. Askew, and then Dr. Sechrist. Thank you very much. Thank you. Thank both counsel for your argument this morning. Arstead v. Estrue is submitted. We'll next hear argument in Daltug v. Cashman Equipment Corporation.
judges: Hawkins, McKeown, Bea